May it please the court and counsel. We're asking your honors to reverse, in this case, and vacate the convictions or remand for a new determination on restitution, forfeiture, and sentencing. And the reason we're asking your honors to vacate the convictions is that the evidence was insufficient to prove the counts. And just to briefly recap what the government alleges here with respect to the wire fraud counts, that is, counts 1 through 50. The government alleges that Marcin Garbacz, a Catholic priest, stole cash offerings from Catholic churches in the Rapid City area over a six-year period and then deposited that cash into his Black Hills checking account. And the counts are separated into two types. There are 47 charged deposits of the cash, and then there are three charged instances where the government alleges that Garbacz used cash in the account to pay off his credit card. And I'd like to start with those latter three counts. Those counts are counts 39, 41, and 44. In order to convict Garbacz of wire fraud, the government had to prove that the transaction at issue furthered the fraudulent scheme. Or to put it in the language of the statute, that the transaction was done, quote, for the purpose of executing the scheme. But the problem here is that merely using money in one's account, even assuming it's ill-gotten, simply to pay off one's credit card does not further the fraudulent scheme. And for that reason, the evidence on counts 39, 41, and 44 is insufficient. Well, what about the use of circumstantial evidence to establish that the quantity of the funds and the source of the funds were such that they were indicative of those funds being the funds that were taken? Your Honor, on this first argument, what I would say is even assuming that the government proved that those funds were stolen, merely using money in one's account to pay off one's credit card does not further the fraudulent scheme. And then moving on to the speculation argument, which all the evidence is relevant to, what we would say is that, and this also includes the 47 charged deposits, that the government's case rested on the assumption that any given charged deposit necessarily involves stolen offering funds. But that assumption was too speculative to justify conviction on this record. Consider the main evidence the government relies on here. Garbosh was caught on surveillance video stealing cash offerings one time from St. Therese Parish in April 2018. He admitted in April 2018 that he took cash offerings on five different weekends from the St. Therese Parish in March and April 2018, totaling approximately $700. And then if you take that evidence and you combine it with all the circumstantial evidence, that still does not prove beyond a reasonable doubt that, for example, the $100 deposit on August 22, 2012, necessarily involved the proceeds of offering theft. And that was charged in count two. And all that evidence also, for example, does not prove, as charged in count one, that the deposit of $246.12 in July 2012 necessarily involved stolen offering funds. The government's case here focuses on the claim that they proved that some chunk of this money was stolen from the churches. But the problem is that the government needs to prove that each individual charged use of the wires necessarily involved those stolen funds. And on this record, the evidence was insufficient to show that. And I guess I would also note that for the 47 charged deposits, those also did not further the fraud, even assuming that they involved stolen offering funds, because merely depositing cash after one has stolen it is not in furtherance of a fraudulent scheme. It's different than if you're talking about electronic funds or a check. We're talking about cash here. So at the point that, even assuming Garbage did steal it from a church, at the point that he walked out of the church with the money, what he did with it at that point, on this record, did not further the scheme or the government did not prove that it did. And if I may, I'd like to jump to the tax counts. Those are accounts 61 to 65. Now, in order to prove Garbage guilty of these counts, the government had to prove that his underreporting was willful. That is to say that he was subjectively aware that he had to report stolen funds, and not just stolen funds, but funds stolen from a tax-exempt source. But the government's proof on that mental state was lacking here, so the evidence was also insufficient to prove the tax counts. What did the government have to prove? What was the required mental state and what evidence would be required to suffice? The government had to prove that Garbage was subjectively aware that he had to report stolen funds from a tax-exempt source. And, you know, in order to prove that, they would have had to come up with some evidence or introduce some evidence that the time that he signed his tax returns, he knew that he was supposed to do that. And essentially, in this case, the prosecutor at trial argued that Garbage satisfied this mental state because he did his own taxes, he enjoyed doing his own taxes, and his taxes were otherwise correct, other than an error in his 2016 taxes. But that is not enough to prove the mental state. And I would note that there were later statements that Garbage made to Joshua Van Buskirk in a text message and in a jail phone call. And he did say in these that he hoped the IRS just fined him for back taxes or that he thought that maybe the government could likely prove that he evaded taxes. But these statements were made after Internal Revenue Service Special Agent Brian Pickens contacted him and informed him of the investigation, and the jail call was made after he had been arrested and charged in the case. So at those points, obviously, he was aware that he was under a tax investigation and under indictment. And those statements don't prove that he knew he was supposed to report these funds at the time that he signed his returns. And if I may, I'd like to next address the issue of restitution, which is also relevant to the loss amount. Now, the district court's assumption here was that every cent of every single deposit at issue necessarily represented the proceeds of offering theft, other than the $1,000 that was subtracted. And that assumption is even more speculative than the assumption in the context of the wire fraud counts. Was there evidence of other sources of funds to constitute the deposits? Well, there was evidence at trial. Priests testified that Catholic priests could get cash tips from parishioners for performing services like baptisms and especially weddings. They testified that priests can get cash gifts for holidays from parishioners. Didn't they also indicate that it was less likely that your client would receive those because of his particular duties? That is correct, Your Honor. Because he was the chaplain for the local school, there was testimony that it was less likely that he would receive those types of tips and funds. But even so, the award of restitution of the $258,000 was still speculative on this record. And also, there was evidence that Garbosh had told numerous people that he got gifts from his family. So there was evidence that some of this money could have come from elsewhere. And also, the district court also erred, not just in the aggregate amount of restitution, but also in awarding each of the three victim churches $86,000 apiece, because there was absolutely no evidence of each individual church's individual losses in the case other than the admissions that Garbosh made to taking $700 from the St. Teresa Parish. But what's the unfairness to the defendant in terms of what distribution the court chose to make? It would seem that would be between some unfairness as between them if one or more suffered disparately. But how is that a reversible error prejudicial to the defendant? Well, I would say that the statute requires that the district court award restitution to each victim based on their actual provable loss. And we would say that the fact that the award to each victim was not supported by the record is also relevant to lowering the total amount of restitution. If the amounts go to the individual victims, and there's just no evidence here of what the individual victims lost. And, Your Honor, if I may, I would like to reserve the remainder of my time. Can I ask just one question first? Yes. You argued early on that the deposits or the payment of the credit cards couldn't constitute money laundering because it wasn't in furtherance of the scheme. Is that the appropriate standard for money laundering? I thought maybe for the wire fraud, the wire has to be in furtherance of the scheme. I get that. I thought money laundering, it had to have the purpose of concealing the source of the unlawful funds. Am I missing something? No, Your Honor. Your statement is entirely accurate. When I made that point earlier, and I may have misspoken, but I was referring to the wire fraud counts, not money laundering. Okay. Thank you. Yes, you're welcome. If I may, I would like to reserve the remainder. Thank you, Mr. Dean. Thank you. Mr. Coloner. Good morning, Your Honors. May it please the Court. I'm a colleague of Mr. Dean. I'm Kevin Coloner from the U.S. Attorney's Office in South Dakota, representing the government in this appeal. Your Honors, for over 30 years now since the decision in Schmuck v. United States, the law surrounding the fraud statutes, mail fraud and, by extension, wire fraud, the law surrounding those has been clear for certain types of fraud schemes, and those are the ones that are ongoing, comprised of many individual thefts, ones that aren't one-shot operations, to use the Supreme Court's words. A charged wire only need to be incident to an essential part of the scheme or a mere step in the plot. The question, at least in Mr. Garbaccia's mind. Not just incident to, it has to be in furtherance of, right? In furtherance, right. But how in furtherance has been defined is it has to be incident to an essential step. Well, okay, incident to an essential step, maybe. Right. And the more precise question is, what was in Mr. Garbaccia's mind at the time? Were his deposits a feature of what allowed the scheme to continue, a reason that he was allowed to maintain the secrecy among his fellow priests, to maintain his reputation, which meant that he still retained access to these places that he was stealing money? We know that Mr. Garbaccia thought the deposits were necessary, and we know that from a variety of evidence. He didn't save up cash and make lump sum deposits $10,000 at a time. No, he deposited the money very regularly. The evidence was that the deposits were consistently right after he would have stolen the money, in this window when the money had been uncounted. Did so when the ATM deposits started in the dark of night, sometimes in the middle of the night, 2 o'clock in the morning. There's even evidence that at one point he made an excuse when he was with his fellow priests at a retreat, saying that he wanted to go sleep in his own bed, and then the government tied that into some of these late night deposits. Evidence that he was parking outside of his garage so he could sneak away at night. The deposits were the wires? The wires comprising 47 of the 50 wire fraud counts. Mr. Dean started his argument by talking about, I think it was counts 39, 41, and 44, where he said they were money laundering charges based on payments from the bank account to pay for credit cards. Right. Is that right? That's correct. How is that an attempt to conceal the source of the funds? That just seems like a use of the funds, and I didn't think that could be a basis for money laundering. Under these particular facts, it was how he used those funds. That gets into the evidence that the government cited a lot in its brief about the particular nature of his living circumstances. What he was ultimately doing is he was converting these small denomination offering funds that he was stealing into things like these chalices and these ornamental items. You can't go buy those with ones and times change. You have to convert those into a form that you can spend with a credit card to pay someone in Poland. Why was that important that he was purchasing those? Why was that important to the scheme? Well, he's living in this very unique situation. He's living surrounded by his fellow priests. Everyone knows everyone's salary. There's suspected cash that was lower than what the usual offerings were. That was a topic of discussion. Why are the cash offerings down, but all the other offerings stay the same? In that particular scenario, there's also testimony that priests were in and out of each other's living quarters. You can't have piles of ones and fives and nickels and dimes around. You've got to convert them into things. In his case, he converted them into these items that he then, when asked about them, how do you afford these things, he passed them. He claimed they were gifts. He even had some of them inscribed to appear to be gifts. He talked about how he'd gotten gifts from family members, things like that. There's no evidence whatsoever of that. That's why these three credit card transactions are also part of the scheme. Why were those three out of all of them chosen? They were chosen simply because they were able to easily tie those into particular purchases. I would note, Your Honor, though, that if the court finds that those three counts are attenuated, the sentences here, of course, were concurrent. Those three counts play no role in the restitution amount. The restitution amount was based solely on the cash deposits. In other words, if the court finds that those are too attenuated to be in furtherance of the fraud scheme, it shouldn't remand for resentencing. Now, why do we know that the deposits were from stolen cash? Well, of course, he was caught on camera. And he was opening and replacing these tamper-proof bags, caught on camera doing exactly what someone would do if they were stealing cash in this brief window of time from these various parishes. What was the period of time that the thefts took place? Well, 2012 into 2018 were the charged transactions. Those were all based on the cash deposits that were found to be in his account. Now, he was caught on camera. There was one camera observation? How many cameras? There was only one time when ultimately that's how it came to light. That's how he got caught. And that's when it stopped, right, when he was confronted by the bishop after he'd been caught on camera. But what he was caught doing was consistent with the way cash would have been stolen all the way back to 2012. He confessed in part. He admitted to others that he'd been stealing. He admitted in, you know, of course he minimized in his confession, but he admitted that he'd been stealing for several years. The denominations that had been deposited all the way back to 2012, there was a lot of evidence about these denominations and why that was consistent with what a church would expect to receive in offerings. Why that's important is because he tries to explain now that these were gifts from family members. These may have been for a funeral or a wedding. What he was depositing are ones, fives, and twenties, change often. It really is sort of incredible to think that, you know, you have a wedding and you slip the priest $17.45 in change. So the denominations are important in the sense that they showed also the consistency with these deposits being from the offering thefts. A lot of testimony in this case about what his legitimate earnings were and how those legitimate earnings were paid to him. They were paid almost without exception via electronic deposit, including the stipends that he claimed. They, even things like funeral stipends, there was testimony, those are paid via check by a funeral home. They're not usually in cash. Of course, as Judge Kobus, as you mentioned, there was evidence that he had fewer opportunities than other priests to get any sort of cash payments. You know, not many school chaplains are doing baptisms or funerals or weddings. But even if he had been in a normal duty, that would not have explained this. There was testimony from one priest who said in 25 years, the most he's ever gotten for doing a wedding was $200 one time. That doesn't explain, you know, all of these deposits. Also, of course, there was evidence that he can't be employed elsewhere. They looked. They looked for W-2s. Even when his computer and his cell phone were located, they looked for any evidence whatsoever of other employment. They found none. No records whatsoever of gifts from family members. Again, it'd be odd to get a gift from family in Poland and have it be in change, ones, fives, things of that nature. So I do want to talk about the tax counts. In order to prove the tax convictions, the laws that we had to prove that he made false documents as to a material matter that he didn't believe to be true and that he acted willfully. Willfully in this context means volunteering intentional violation of a known duty. Intent can be conferred from conduct. There's, of course, a wealth of well-established tax law that says the government doesn't have to prove what's in a defendant's mind, but they can prove it from circumstantial evidence of conduct. Here we have evidence that he filed regularly his tax returns, even at times making quarterly payments. He made statements almost boasting to some fellow priests about his knowledge of tax matters. And then after the fact, after he was caught true in jail, he's talking on a jail call and saying, well, they might be able to convict me of these tax evasion accounts. So that's the sort of evidence that you have in most tax cases with respect to willfulness. We have these, you know, he knew clearly the money that he was bringing in from this cash and depositing his bank accounts. There's evidence that he spent over $400,000 in this period of time on a variety of items. So in terms of his knowledge of what his income was. How much did he, for that period of time, how much did he report as income? He only reported on the taxable amount from his earnings from the Catholic Church. So it was a minimal amount each year, I think about $3,000 to $4,000 a year in taxes that were paid as taxes on the legitimate income, but not on the stolen cash. What was the total amount of the stolen cash? Well, it was proved, but nobody knows is the reality here. Because what was proved at trial was it was about $260,000 based solely on the cash deposits into the account, excluding all the other types of deposits. The solely cash deposits, about $260,000. What I say that nobody knows is the great unknown in this case is the cash that he may have taken and just spent outright and not deposited. We know, for instance, when he opens a bank account in St. Louis, he deposits some $7,000 that he had. We also, of course, know at the end of this whole scheme, there's $40,000 that came out of a bank account that was unaccounted for. So it's the nature of this particular theft, what made this pool of money that a church had for a certain period of time before it was accounted for, what made it vulnerable to this sort of embezzlement scheme. I know you have a lot of discretion on the charges that are brought, and having prosecuted a lot of white-collar cases myself, I look at $260,000 in a 93-month sentence, and it just seems a little out of line for a typical $260,000 theft case. But, I don't know, maybe it's the circumstances and the money laundering. Well, you know, Your Honor, as I've myself argued to district courts and sentencings on cases like these, these long-standing embezzlement cases, they involve criminal moments, sometimes thousands of criminal moments over, in this case, six years, violations of trust, stealing essentially from his parishioners here. And that's an argument I've made to district courts. Sometimes it's been well-received, sometimes it hasn't. But I do think that it's within the realm of a reasonable sentence given just the breadth of time here and the sheer number, almost, you know, multiple criminal acts every week for six years. Was it a within-guideline sentence? I'm sorry? Was the sentence within the guideline range? It was. The sentence was separated essentially into two groups, the tax counts and the non-tax tax counts. And the groups were ordered to run consecutive to one another. But within each of those groups, it was a guideline range sentence. Well, it seems you had a pretty simple methodology. How is it, how does it qualify as a sophisticated means? Well, you know, we've cited a number of the cases that this Court has written over the years about this particular guidelines enhancement. And the Court's held in a number of cases that sophisticated means doesn't necessarily require that each individual step on its own be sophisticated. I'll grant that, you know, stealing cash in the dark of night and depositing it in an ATM if it was done one time isn't particularly sophisticated. But here you have these repeated coordinated steps, all of these measures to retain, you know, secrecy, including buying tamper-proof bags when the church starts, you know, looking them up, ordering them online, going in and, you know, changing the numbers, all of this sort of secretive conduct that he engaged in over the period of, long period of time of this. And that, in cases like Houston, Fiorito, this Court has held that those sorts of repetitive conduct can meet this standard. I'm out of time, but I would just mention also that on this record, the Court noted that it would have reached the same sentence regardless of the enhancements in the sense that it said that it would have reached the same sentence under the discretionary statutes. Thank you, Your Honors. Thank you, Mr. Coloner. May it please the Court. The government argues for the first time on appeal that the transactions that were charged here, mainly the deposits, furthered the fraudulent scheme by concealing the money. But I would note that- Is it for the first time because it wasn't raised by the defense in the trial court? Well, what I would say on that is that- I think the government argues that you should be on plain error review on that particular issue. They do allege that. I would note that on the three counts where they charged the paying off of the credit card, 39, 41, and 44, trial counsel moved for judgment of acquittal on all the counts, including counts 1 through 50. Wait a minute. That's the money laundering charge. You're arguing the wire fraud charge, right? Your Honor, counts 39, 41, and 44 were also wire fraud charges. I think they've got to be one or the other. I don't think they can be both. They were charged as wire fraud. It might have been wire fraud was the basis for the specified unlawful activity for the money laundering. That could be. But it would be highly unusual and very objectionable on your part if, in fact, they charged two violations in one single count. That's a problem. Yes. They charged those counts only as wire fraud. And there was a motion for judgment of acquittal on all the counts. There was no argument on those 39, 41, and 44, so we would submit that that's a general motion for judgment of acquittal and that those claims are then preserved. And then on the other issues, we would note that defense counsel, in making the motion for judgment of acquittal, never indicated that the arguments that it made were exhaustive. There was no language saying that these were the only arguments that were raised. We would say that the points raised were illustrative, not exhaustive, that they set the floor for what the district court could consider, not the ceiling. And also, we would note that the district court just issued a general denial. There was no specific reason other than setting out the standard for sufficiency. So we argue that all our arguments on the wire fraud are preserved. And I would also note that this Court has case law that indicates that if there is a motion for judgment of acquittal, then all claims of factual insufficiency are preserved. And here, the argument is that the evidence was factually insufficient because on this record, the evidence was lacking that any given charged wire fraud transaction furthered the fraud. And, Your Honors, we would ask the Court to reverse for these reasons. Thank you. Thank you, Mr. Dean. Thank you also, Mr. Coloner. We appreciate both counsel's presentations to the Court this morning and the briefing that's been submitted, and we'll take the case under advisement. Thank you.